J-S14011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRANDON JOHNSON | : | |
| | : | |
| Appellant | : | No. 229 EDA 2017 |
| | : | |

Appeal from the PCRA Order December 14, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0015920-2010

BEFORE:   OTT, J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY OTT, J.:                           **FILED MAY 15, 2018**

Brandon Johnson appeals from the order entered December 14, 2016, in the Philadelphia County Court of Common Pleas, denying his first petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1] Johnson seeks relief from the judgment of sentence of life imprisonment, imposed on March 1, 2012, after he was convicted by a jury of first-degree murder, attempted murder (two counts), aggravated assault (two counts), conspiracy, carrying a firearm without a license, and possessing an instrument of crime.[2]   On appeal, Johnson argues trial counsel rendered ineffective

---

* Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

[2] **See** 18 Pa.C.S. §§ 2502(a), 901(a), 2702(a), 903(c), 6106(a)(1), and 907(a), respectively.

assistance by advising him to waive his right to testify at trial. For the reasons below, we affirm.

The facts underlying Johnson's conviction were summarized by a panel of this Court on direct appeal as follows:

> [Johnson's] convictions arose from his participation in a shooting spree that occurred on September 25, 2010, in which Tawayne Foster was killed. At the time of the incident, Mr. Foster was with his friends William Brown, James Marshburn, and Amanda Alston, all of whom testified at trial on behalf of the Commonwealth. Mr. Brown, who was licensed to carry a concealed weapon, returned fire during the episode and was struck in the hip with a bullet. Mr. Foster also was licensed to carry a gun but never retrieved his weapon before he was shot. When the shooting started, Mr. Foster was located in the driver's seat of his Cadillac, which was idling on 65th Steet and Chester Avenue, Philadelphia, and he died from gunshot wounds to the chest.
>
> Ms. Alston had been [Johnson's] girlfriend prior to the shooting episode, but they were no longer a couple on September 25, 2010. She testified as follows. [Johnson] and Donte Jones, who was [Johnson's] co-defendant at trial, were friends. In the early morning hours of September 25, 2010, Mr. Foster, Mr. Brown, and Mr. Marshburn went to Ms. Alston's apartment, where a party was transpiring. Ms. Alston reported that Jones attended the gathering; [Johnson] did not. After spending a few minutes in Ms. Alston's apartment, Mr. Foster and his two friends left the party, and Ms. Alston went down to the street after them to speak with Mr. Foster.
>
> When Ms. Alston arrived on the street in front of her residence, [Johnson] was there. He approached Ms. Alston and told her to pick up her children from the home of his aunt, who was babysitting them during the festivities. Ms. Alston telephoned [Johnson's] aunt, who stated that she did not want to become involved in the controversy and confirmed that she wanted the children retrieved. Ms. Alston then asked Mr. Foster for a ride. Mr. Foster, Ms. Alston, Mr. Brown and Mr. Marshburn drove to the home of [Johnson's] aunt, retrieved the children, and transported

them to their grandmother's home. The four individuals then returned to Ms. Alston's apartment.

Mr. Foster, who was driving, stopped his car on 65th Street and Chester Avenue, and Ms. Alston exited it and began to speak with Mr. Foster through the driver's side window. Mr. Foster was giving Ms. Alston a telephone number, which she was programming into her telephone, when [Johnson] and Jones, who was directly behind [Johnson], approached Ms. Alston. [Johnson] was angry about the fact that Ms. Alston was entering the telephone number and asked her if Mr. Foster was her new boyfriend. She responded that Mr. Foster was not her boyfriend and explained that he was the father of her best friend's children. [Johnson] then grabbed the cell phone from Ms. Alston's hand, and she snatched it back. Jones then joined the conversation by asking if there was a problem. Ms. Alston retorted, "There is no problem ... [, Jones], go home."

At that point, [Johnson] began to insist that Mr. Foster exit the car, but Ms. Alston urged him to leave the area. Mr. Foster began to drive away. At that moment, Ms. Alston "heard [Jones] say f−−− it and he pulled out the gun and started shooting" into Mr. Foster's car. Ms. Alston fled, but, after a few moments, she turned around and observed Mr. Brown returning fire in the direction of [Johnson] and Jones. Jones was shot in the leg and went to the hospital.

Mr. Marshburn testified as follows. On the night in question, he, Mr. Foster, and Mr. Brown went to Ms. Alston's apartment briefly to use the bathroom during the party. Once they arrived, Mr. Marshburn saw Jones, whom Mr. Marshburn described as tall and wearing an orange shirt and his hair in braids. Mr. Marshburn confirmed that, after he and his two companions left Ms. Alston's apartment, Ms. Alston came onto the street, conversed with [Johnson], and approached Mr. Foster to request a ride to pick up her children. After retrieving the children and transporting them to their grandmother's residence, the four adults then returned to the street outside of Ms. Alston's home. Ms. Alston exited the car and walked around to the driver's side to obtain a telephone number from Mr. Foster.

At that point, [Johnson], who was accompanied by Jones, approached the car and started to yell at Ms. Alston because she was transcribing the telephone number. Ms. Alston replied that Mr. Foster was a friend, but Johnson started "yelling and telling

- 3 -

[Mr. Foster] to get out of the vehicle." When Mr. Marshburn saw [Johnson] take the cell phone from Ms. Alston's hand, he told Mr. Foster to leave. As Mr. Foster, Mr. Marshburn, and Mr. Brown "were about to pull off, that is when the first shot was fired." Mr. Marshburn reported that [Johnson] retrieved a gun from his waistband and shot first at Mr. Foster, who immediately slumped over the steering wheel. Mr. Marshburn related that Jones then joined in his friend's actions by retrieving a gun and shooting at the car.

Mr. Marshburn crouched down in the back seat, and the Cadillac crashed into another car. After a few moments, Mr. Marshburn peered from the vehicle and saw Mr. Brown outside returning fire at [Johnson] and Jones. Mr. Brown was struck by bullets and was taken to the hospital while Mr. Marshburn, who was uninjured, was interviewed by police. Mr. Marshburn was later transported to the hospital, where he identified Jones as one of the shooters.

Mr. Brown confirmed the preceding events by testifying as follows. He, Mr. Foster, and Mr. Marshburn stopped by Ms. Alston's apartment on the night in question so that Mr. Brown and Mr. Foster could use the bathroom. After the three men left and returned to the street, Ms. Alston asked for a ride to obtain her children. After performing that task, the four friends returned to Ms. Alston's apartment. While Ms. Alston was obtaining a telephone number from Mr. Foster, Mr. Brown saw [Johnson] and Jones approach the car together. [Johnson] began to argue with Ms. Alston while Jones stood three or four feet behind [Johnson]. Mr. Brown saw [Johnson] take the telephone from Ms. Alston's hand, and he told Mr. Foster that they should leave.

As Mr. Foster placed the car in drive, Mr. Brown heard multiple shots. Mr. Brown related that after hearing the shots, "I turned and looked to my left and I see the guy in the orange shirt [*i.e.,* Jones], the gun in his hand pulling it out and continuing to shoot, shoot, shoot, shoot." At that point, Jones was located three to four feet away from the driver's side car door. Mr. Brown testified that "when the guy with the orange shirt [, Jones,] opened fire, the other guy [, [Johnson],] backed up. And as I got out of the car, [Johnson] started shooting." After the car crashed, Mr. Brown exited it and started shooting at [Johnson] and Jones while they continued to shoot at him. Mr. Brown was struck by bullets in the hip and below the ribcage.

*Commonwealth v. Johnson*, 93 A.3d 498 [1867 EDA 2012] (Pa. Super. 2013) (unpublished memorandum at 1-6).

Johnson was subsequently arrested and charged with the aforementioned crimes. Johnson was convicted of all charges, and, on March 1, 2012, he was sentenced to an aggregate term of life imprisonment for the offense of first-degree murder. Johnson filed a timely post-sentence motion, which the trial court denied. His judgment of sentence was affirmed by a panel of this Court, and the Pennsylvania Supreme Court denied his petition for allowance of appeal. *See Commonwealth v. Johnson*, 94 A.3d 1008 (Pa. 2014).

On May 14, 2015, Johnson filed a timely, *pro se* PCRA petition. Counsel was appointed and filed an amended petition on December 4, 2015. An evidentiary hearing was conducted on December 12, 2016.[3] The next day, the PCRA court entered an order denying relief. This timely appeal followed.[4]

Our review of an order denying PCRA relief is well-settled:

This Court reviews a PCRA court's decision in the light most favorable to the prevailing party. *Commonwealth v. Hanible*, 612 Pa. 183, 30 A.3d 426, 438 (2011). Our review is limited to a determination of whether the record supports the PCRA court's

---

[3] It is unclear why the hearing was not conducted until a year later.

[4] On April 13, 2017, the PCRA court ordered Johnson to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Johnson complied with the court's directive and filed a concise statement on April 24, 2017.

factual findings and whether its legal conclusions are free from error. ***Id.*** "A PCRA court's credibility findings are to be accorded great deference, and where supported by the record, such determinations are binding on a reviewing court." ***Commonwealth v. Treiber***, ___ Pa. ___, 121 A.3d 435, 444 (2015) (citing ***Commonwealth v. Dennis***, 609 Pa. 442, 17 A.3d 297, 301 (2011)). We review the PCRA court's legal conclusions de novo. ***Commonwealth v. Roney***, 622 Pa. 1, 79 A.3d 595, 603 (2013).

***Commonwealth v. Williams***, 141 A.3d 440, 452 (Pa. 2016). Furthermore, where, as here, the defendant alleges counsel rendered ineffective assistance, we note:

"In order to obtain relief under the PCRA premised upon a claim that counsel was ineffective, a petitioner must establish beyond a preponderance of the evidence that counsel's ineffectiveness 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.'" ***Commonwealth v. Payne***, 794 A.2d 902, 905 (Pa. Super. 2002), *quoting* 42 Pa.C.S.A. § 9543(a)(2)(ii). When considering such a claim, courts presume that counsel was effective, and place upon the appellant the burden of proving otherwise. ***Id.*** at 906. "Counsel cannot be found ineffective for failure to assert a baseless claim." ***Id.***

To succeed on a claim that counsel was ineffective, Appellant must demonstrate that: (1) the claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) counsel's ineffectiveness prejudiced him. ***Commonwealth v. Allen***, 833 A.2d 800, 802 (Pa. Super. 2003).

***Commonwealth v. Michaud***, 70 A.3d 862, 867 (Pa. Super. 2013). "To demonstrate prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's actions or inactions, the result of the proceeding would have been different." ***Commonwealth v. Mason***, 130 A.3d 601, 618 (Pa. 2015).

In the present case, Johnson asserts trial counsel provided ineffective assistance when he advised Johnson to waive his right to testify in his own defense. Preliminarily, we acknowledge "[t]he right of an accused to testify on his own behalf is a fundamental tenet of American jurisprudence and is explicitly guaranteed by Article I, Section 9 of the Pennsylvania Constitution." **Commonwealth v. Nieves**, 746 A.2d 1102, 1105 (Pa. 2000). Accordingly,

> [t]he decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. **Commonwealth v. Uderra**, 550 Pa. 389, 706 A.2d 334 (1998); **Commonwealth v. Bazabe**, 404 Pa.Super. 408, 590 A.2d 1298, *alloc. denied*, 528 Pa. 635, 598 A.2d 992 (1991); **Commonwealth v. Fowler**, 362 Pa.Super. 81, 523 A.2d 784, *alloc. denied*, 517 Pa. 598, 535 A.2d 1056 (1987). In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf. **Id.**

**Id.** at 1104. **See also Michaud**, **supra**. Moreover, when evaluating the prejudice prong of an ineffectiveness claim for providing unreasonable advice, we consider "whether the result of the *waiver proceeding* would have been different absent counsel's ineffectiveness, not whether the outcome of the trial itself would have been more favorable had the defendant taken the stand." **Commonwealth v. Walker**, 110 A.3d 1000, 1005 (Pa. Super. 2015), *appeal denied*, 125 A.3d 777 (Pa. 2015). This Court has recognized that "a defendant who made a knowing, voluntary, intelligent waiver of testimony may not later claim ineffective assistance of counsel for failure to testify." **Commonwealth**

***v. Lawson***, 762 A.2d 753, 755 (Pa. Super. 2000), *appeal denied*, 781 A.2d 141 (Pa. 2001).

In the present case, Johnson contends his claim has arguable merit because he "consistently told his attorney during pre-trial preparation of the case that he was innocent of the charges[,]" specifically, that he did not have a gun on the night in question, and "barely knew" Jones, the person with whom he allegedly conspired to commit the crime. Johnson's Brief at 13-14. Moreover, he argues counsel had no reasonable basis for advising him not to testify, particularly after Jones' testimony. ***See id.*** at 19. He acknowledges that the testimony of both Alston and Jones exonerated him, but contends the jury could have discounted their testimony as self-serving because Alston was his ex-girlfriend and Jones was on trial for his culpability. ***See id.*** at 19-20. Johnson also insists counsel's advice was unreasonable because (1) there was no physical evidence linking him to the shooting, (2) he had "no difficulty adequately recalling and communicating what happened the night of the crime," and (3) he had "no prior adult *crimen falsi* convictions" or made any prior statements, which could have been used to impeach his testimony. ***Id.*** at 29. Lastly, Johnson maintains that but for counsel's unreasonable advice, the outcome of the proceeding would have been different, that is, he would not have waived his right to testify. ***See id.*** at 30-31.

The PCRA court determined that Johnson knowingly and voluntarily waived his right to testify after an on-the-record colloquy. ***See*** PCRA Court

Opinion, 6/8/2017, at 2-4, 8. The court stated, "[t]hough [Johnson] consulted with counsel, the choice not to testify was his own." *Id.* at 8.

Our review of the transcript from Johnson's jury trial supports the court's finding. The trial court conducted a thorough on-the-record colloquy with Johnson before he waived his right to testify, during which it informed him that the decision to testify is "yours and yours alone to make." N.T., 2/14/2012, at 25. Although the colloquy occurred before Jones testified, the trial court specifically informed Johnson, twice, that he was "free to change [his] mind at any point before [his] attorney rests" and all he had to do was tell either the court or his attorney that he changed his decision. *Id.* at 25-26. Subsequently, after Jones testified, the trial court against asked Johnson if it was his still his choice to waive his right to testify, to which Johnson replied, "Yes." *Id.* at 84. During the colloquies, Johnson also indicated he was satisfied with his attorney's representation. *See id.* at 26, 86.

Johnson emphasizes the court told him he should be "strongly guided by the advice" of his counsel. *See* Johnson's Brief at 21. However, in context, the court's statement is not objectionable. Prior to making that statement, the trial court informed Johnson he had an "absolute right" to testify or not to testify, and [t]he decision is yours and yours alone to make." N.T., 2/14/2012, at 24-25. The trial court then stated: "In making that decision you should be strongly guided by the advice of your attorney. Nevertheless, if you disagree with his advise (sic) it is your decision that I will follow." *Id.* at 25. Therefore, we find the court's colloquy properly informed Johnson of

- 9 -

his right to testify. *See Lawson*, *supra,* 762 A.2d at 755 ("[A] defendant who made a knowing, voluntary, intelligent waiver of testimony may not later claim ineffective assistance of counsel for failure to testify.").

Furthermore, the PCRA court also concluded counsel had a reasonable basis for advising Johnson not to take the stand. The court opined:

> The defense theory was already in the record through the testimony of Amanda Alston – that [Johnson] did not have a gun, that [Johnson] did not shoot the deceased, that Donte Jones shot the deceased spontaneously and that there was no conspiracy involving [Johnson]. Moreover, [d]efense counsel stated that the physical evidence was consistent with the defense theory.
>
> [Johnson] benefited by not testifying. He was spared cross-examination and his credibility was not an issue.

Trial Court Opinion, 6/8/2017 at 9.

Our review of the record, the parties' briefs and the relevant case law reveals no error or abuse of discretion on the part of the PCRA court. Even if we assume Johnson's claim has arguable merit, and that absent counsel's advice, Johnson would not have waived his right to testify in his own defense, we conclude trial counsel provided a reasonable basis for advising Johnson to waive his right to testify. *See Commonwealth v. Keaton*, 45 A.3d 1050, 1061 (Pa. 2012) ("Failure to establish any prong of the test will defeat an ineffectiveness claim.").

The Pennsylvania Supreme Court has explained the "reasonable basis" prong of an ineffectiveness claim as follows:

> When assessing whether counsel had a reasonable basis for his act or omission, the question is not whether there were other courses of action that counsel could have taken, but

whether counsel's decision had any basis reasonably designed to effectuate his client's interest. [T]his cannot be a hindsight evaluation of counsel's performance, but requires an examination of "whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect [the] defendant's interests." Our evaluation of counsel's performance is "highly deferential."

*Commonwealth v. Williams*, 141 A.3d 440, 463 (Pa. 2016) (internal citations omitted). Moreover, "[w]e will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that 'an alternative not chosen offered a potential for success substantially greater than the course actually pursued.'" *Commonwealth v. Chmiel*, 30 A.3d 1111, 1127 (Pa. 2011).

Here, trial counsel testified at the evidentiary hearing regarding "two conversations" he had with Johnson concerning the waiver of his right to testify, "once before Donte Jones testified, and once after Donte Jones testified." N.T., 12/13/2016, at 11. Counsel explained that before Jones' testimony, he advised Johnson not to testify "based on the fact that we had in the record the evidence that we needed to present: That he did not have a gun, there was no evidence of a conspiracy between him and Mr. Jones." *Id.* Counsel elaborated:

I believe Ms. Alston said during the encounter at one point, Mr. Jones said, "'F' it," and began to fire. So, to me, there was no evidence of conspiracy between Mr. Jones and Mr. Johnson.

*Id.* at 11-12. However, he told Johnson they would "revisit that issue" after Jones testified, which they did. *Id.* at 12. Trial counsel stated that both he

- 11 -

and Johnson believed Jones "did very poorly on the witness stand," and when Johnson observed that, "he was more reinforced that he did not wish to testify at that particular point." *Id.* at 13. Counsel summarized:

> I advised [Johnson], in my estimation, he had the evidence on the record that he needed to gain an acquittal; namely, Amanda Alston, and the physical evince that was consistent with our version of the events that he did not fire a weapon and there was no conspiracy with Dante Jones to shoot and kill Mr. Foster.

*Id.* at 16. Nevertheless, counsel insisted he "always leave[s the decision] up to the defendant[,]" and, in this case, Johnson told him, "I agree that I don't need to testify in this particular case" because the Commonwealth did not meet its burden of proof. *Id.* at 17-18.

Johnson's testimony at the PCRA hearing largely corroborated counsel's account. While Johnson maintained he would have taken the stand if counsel had advised him to do so, he stated he "really was listening to what [counsel] was telling [him]" and relied on counsel's advice because counsel "knew more than [he] did." *Id.* at 28. He explained:

> [Counsel] was wrong when he said that I agreed that I didn't want to go up there. Because I did want to testify. But I was following his instructions not to.

*Id.* at 49-50. Nonetheless, Johnson conceded he understood it was ultimately his decision to testify or waive his right to do so. *See id.* at 50. Furthermore, when pressed as to whether he expressed his desire to take the stand to counsel, Johnson testified:

> [Counsel] knew. Before [Jones] went up there to testify, I told him I would like to. He said, "Let's wait until afterwards."

And afterwards, we talked again.  And I told him – **I really didn't tell him.**  He just told me he don't think I should testify.

\* \* \* \*

**I said okay**.

*Id.* (emphasis supplied).

Where, as here, counsel's advice was based on an informed decision reasonably designed to effectuate his client's interest, we will not find counsel ineffective.  **See Williams**, **supra**, 141 A.3d at 463.  Moreover, while Johnson insists he would have had a "substantially greater" potential for success if he had testified, we disagree.  Johnson's Brief at 30.  Indeed, Johnson concedes (1) Alston "testified unequivocally that she did <u>not</u> see [him] with a gun in his hands or shoot a gun[,]" and (2) Jones testified Johnson "didn't even know he was there that night until after Jones walked up to the car[.]"  *Id.* at 19, 20 (emphasis in original).  Johnson contends, however, the jury "could easily discount [Alston's] testimony on the basis that she was [his] ex-girlfriend," and "would in all likelihood dismiss [Jones'] testimony as being incredible and self-serving."  *Id.* at 19, 20.  He ignores the fact that the jury may have, just as likely, rejected his testimony as self-serving.  Because counsel's advice was based on an informed strategy designed to effectuate Johnson's acquittal, we will not second guess counsel's assistance in hindsight.  **Compare Nieves**, **supra**, 746 A.2d at 1104-1106 (finding trial counsel ineffective for providing defendant with advice "so unreasonable as to vitiate [defendant's] knowing and intelligent decision not to testify" when counsel erroneously informed

defendant that if he testified, he could be impeached by his criminal record, when the defendant had no prior *crimen falsi* offenses).

Accordingly, because we find the ruling of the PCRA court is supported by the record and the court's legal conclusion are correct, we affirm the order on appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/18